THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY TURNER, Defendant-Appellant.

First District (6th Division)   No. 1—91—3226

Opinion filed March 18, 1994.

Patricia Unsinn, of State Appellate Defender's Office, and Steven J. Rizzi and Keith L. Davidson, both of Keith L. Davidson & Associates, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Mitchell L. Cohen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a bench trial, defendant, Gregory Turner, was convicted of armed violence (Ill. Rev. Stat. 1988, ch. 38, par. 33A—1(b)) and the first degree murder of S.T. (Ill. Rev. Stat. 1988, ch. 38, par. 9—1), and was sentenced to a prison term of 30 years. Defendant appeals, contending that the trial court committed reversible error in denying his motion to suppress inculpatory statements he made to police two days after the murder, which he argues were induced by virtue of having been confronted with evidence illegally seized from his home shortly before he confessed. In addition, defendant argues that the statements should have been suppressed because they were brought about by the exploitation of an unlawful arrest.

The relevant facts are as follows. On June 10, 1988, defendant gave a confession which may be summarized as follows: On June 8, 1988, after he and the deceased had sex, she demanded $30. They continued to quarrel, and defendant hit her with his fist. When she tried to hit him back, defendant stabbed her.

Defendant filed a motion to quash arrest and suppress evidence, contesting his arrest, the search of his parents' house, the seizure of a pair of bloodstained shoes and a sketch, and the admission of his inculpatory statements. At the hearing on the motion, the State called Detective James Boylan. Boylan testified that at approximately 4:30 p.m. on June 9, he and his partner, Detective Michael Cummings, went to the deceased's home, where they interviewed several individuals including a friend named Vetta Cole. Cole informed the detectives that the deceased at one time told her she was afraid of defendant. At approximately 6:30 p.m., Cole accompanied the detectives in their vehicle to defendant's house. They knocked on the door, and defendant's mother answered. Defendant was not at home so they left a business card with her and asked her to tell defendant to contact them. They did not enter the house at that time.

At approximately 11:30 p.m. that night, defendant called the police station and spoke with Detective Lawrence Nitsche. Defendant told Nitsche that he had received the business card and stated that he would come to the station that night. Defendant arrived at 12:30 a.m. with his brother Ricky. Defendant was taken to an interview room, advised of his *Miranda* rights and interviewed by Boylan and Cummings. Defendant stated he understood his rights, did not ask to have counsel present and expressed a desire to speak with the detectives. Defendant was not handcuffed or restrained. He was awake, alert and coherent, and did not appear to be under the influence of alcohol or drugs. Boylan did not consider defendant to be under arrest at that point. He was uncertain whether he made defendant empty his pockets or whether he went through his wallet.

Defendant told the detectives that on the night of the murder he was with his brother and sister-in-law watching a movie at his brother's home. After receiving this information, Boylan and Cummings went to speak with defendant's brother, who was waiting for defendant in the police station cafeteria. They then went to his brother's home to speak with his sister-in-law. Boylan stated that based upon what his brother and sister-in-law had told them, they did not believe defendant told the truth about his whereabouts on the night in question.

At approximately 2:30 a.m., the detectives went to defendant's house. They knocked on the door, and defendant's parents answered

and invited them in. Boylan told them that defendant was cooperating with the police in the investigation of the deceased's murder and that they were questioning him about his whereabouts on the night in question. They asked defendant's mother if she had seen defendant on that particular night. She stated that she heard him come home around 1:30 a.m., go down to the basement where he slept, and leave sometime thereafter. The detectives asked her if they could see where defendant slept, and she and defendant's father took them to the basement. Boylan could not recall whether they told them that defendant said they could search his room.

The detectives noticed a pair of shoes lying on the floor, and they asked defendant's mother if they belonged to defendant. She responded that they did, and Boylan picked them up and noticed what appeared to be bloodstains on the bottom. The detectives asked defendant's mother if they could take the shoes with them, and she said yes. The detectives also observed a drawing on the wall of a woman lying on the floor after having been repeatedly stabbed. When questioned as to what the picture represented, defendant's mother responded that it was something defendant had drawn while in prison. She told the detectives they could take the picture. Defendant's parents did not ask the detectives why they wanted to take the items. Boylan and Cummings then looked through defendant's clothing. They remained in the house for 15 or 20 minutes.

Boylan testified that neither he nor Cummings used any force to enter defendant's house. He acknowledged that they did not have a search warrant.

Boylan and Cummings returned to the station at approximately 3:30 a.m. and, according to Boylan, interviewed defendant again for approximately 20 minutes. Defendant offered no information regarding the deceased's death. During the three-hour period in which the detectives were gone, defendant remained in the interview room with the door open and was not handcuffed or restrained. Boylan did not consider defendant to be under arrest even upon their return at 3:30. Boylan did not tell defendant at any point he could go home, but did not tell him he could not go home. Defendant never asked to leave the station, to use the bathroom, or to have some food or drink. Boylan acknowledged that the police reports did not indicate either that defendant was advised of his rights until Nitsche questioned him at 8 a.m. or that defendant was in fact questioned at 3:30 a.m. After speaking with defendant, the detectives went home.

At the same time Boylan and Cummings were questioning defendant, Nitsche and his partner, Detective Al Wolf, were questioning another man by the name of Saterial Stuttley about the deceased's

murder. Stuttley was a former boyfriend of the deceased. In the course of his investigation, Nitsche learned that Stuttley and the deceased had a confrontation the week before her death and that Stuttley had "slapped her around." Stuttley agreed to come voluntarily to the police station for questioning. He arrived at the station between 6 and 8 p.m. on June 9 and was placed in an interview room. He gave the detectives an alibi for his whereabouts on the night of the murder, and the detectives left to verify it. Stuttley remained in the interview room while they were gone. Stuttley was not placed under arrest, but was advised of his rights prior to giving his alibi. After Stuttley's alibi checked out, Stuttley left the station.

Nitsche acknowledged speaking with defendant on the telephone on June 9 at approximately 11:30 p.m., when defendant called the station looking for Boylan or Cummings. Defendant told Nitsche that a couple of detectives had been at his house in regard to a purse snatching. Nitsche told defendant he did not know about a purse snatching but that a girlfriend or former girlfriend of his had been found murdered. Nitsche informed defendant that the police were questioning her past acquaintances and would like to interview him. Nitsche offered to pick him up, but defendant declined and said he would come to the police station on his own. Nitsche then went home.

When Nitsche arrived at work the next morning, defendant was still at the station being questioned. Sergeant Wilson informed Nitsche that lab tests indicated that human blood had been detected on the bottom of the shoes that were removed from defendant's house. Nitsche was also informed that defendant's alibi did not check out. Shortly thereafter, Nitsche and Wilson went into the interview room and began questioning defendant. Nitsche told defendant his alibi did not check out and that human blood had been found on his gym shoes. Defendant was advised of his rights and indicated he understood them. He expressed a desire to speak with Nitsche and did not state that he wished to have a lawyer present.

Nitsche's conversation with defendant lasted five or six minutes. After defendant was confronted with the information about his shoes and the fact that his alibi did not check out, Wilson left the room and Wolf entered and began taking notes. Defendant was not handcuffed or restrained and did not indicate a desire to leave or to use the telephone. At the end of the conversation, defendant was placed under arrest and an assistant State's Attorney was contacted.

At approximately 10:30 a.m., the assistant State's Attorney and Wolf interviewed defendant. Sometime thereafter, defendant gave a formal statement in the presence of the assistant State's Attorney, Nitsche and a court reporter. Prior to defendant giving the statement,

the assistant State's Attorney advised him of his rights. Defendant then gave his statement, made corrections to it, and signed it. Thereafter, defendant attempted, unsuccessfully, to assist the detectives in finding his knife.

Defendant's father testified that around 2:30 a.m. on June 10, 1988, he was asleep at home when he heard someone banging loudly on the front window. The detectives identified themselves, and he opened the door slightly. The detectives asked him if he knew defendant, and he said that he did. The detectives told him that defendant had given them permission to search the basement. He said nothing at this point, and the detectives then "just pushed the door open and came on in." He did not invite the detectives into the house, nor did they request permission to enter. They did not, however, have their weapons drawn. Once inside, defendant's father opened the basement door and led the detectives down to the basement. Defendant's mother followed. The detectives did not display a search warrant, nor did they tell defendant's parents they had a right to refuse to let them in.

The detectives searched the area of the basement where defendant slept as well as the laundry room. They took with them defendant's gym shoes and the drawing. Neither defendant's father nor mother objected. Defendant's mother testified that she asked the detectives why they were taking the items, and they responded that they wanted to ask defendant a question about the drawing and wanted to see if the gym shoe matched a shoe print that had been left by the assailant.

Defendant's father stated that defendant paid rent to live in the basement, and he considered defendant's area to be private. He stated that he would not go into defendant's area without his permission.

Defendant's mother testified that she spoke with Cummings the evening of June 9. Cummings told her that defendant had assisted in catching a purse snatcher and that his sister was with him at the time. When the sister stated she knew nothing about a purse snatching, the detectives told defendant's mother to have defendant call them when he returned.

When the detectives arrived at defendant's house at 2:30 a.m. the next morning, they asked defendant's mother if they had heard about "the girl," and she said she had. They told her that defendant had given them permission to search his apartment and was being "very cooperative." When it became clear to her that the detectives were planning to take the gym shoes and drawing, she asked them why they needed the items. They stated that the offender wore size 12 shoes and they wanted to compare defendant's shoes with a footprint

found near the deceased's body. They also stated they wanted to ask defendant something about the picture. She told the officers they did not need the picture, but they took it and the shoes anyway.

Defendant testified that at 11:50 p.m. on June 9, he and his brother went to the police station. Cummings and Boylan took defendant to an interview room for questioning. Defendant's brother did not accompany him. The door to the room was closed, and Cummings and Boylan asked defendant what he knew about the deceased's murder. Defendant responded that he knew nothing. To defendant's recollection, he was not advised of his rights.

After the detectives asked him some questions, they told defendant to remove everything from his pockets. Defendant asked them whether they were placing him under arrest, to which one of the detectives responded, "just do what I tell you to do." Defendant refused to let them go into his pockets, so they handcuffed him and then searched his pockets, removing his wallet and keys.

After 15 minutes, the detectives removed defendant's handcuffs and told him to take off his shirt. He eventually put his shirt back on and was again handcuffed. Defendant again asked if he was under arrest and requested a telephone call and an attorney. One of the detectives laughed at him, refusing both requests. When defendant asked why he was not permitted to make a phone call, the detectives left and locked the room, leaving him alone and handcuffed. Defendant considered himself to be under arrest, did not feel free to leave, and was not shown any arrest warrant. This initial interview lasted 15 or 20 minutes.

Cummings and Boylan came back into the room 5 to 10 minutes later, interviewed defendant for another 10 or 15 minutes, then left. Defendant remained handcuffed and was left alone for several hours. He was not allowed to use the bathroom. At some point, he got up from the chair and kicked the door several times until an officer came to the door. The officer would not let him out of the room so defendant used the floor as a washroom.

Defendant stated that he was intoxicated when he came to the police station. He drank one or two quarts of beer on the way there. When the detectives returned several hours later, they looked into the room and defendant pretended to be asleep. Defendant noticed something in their hands. He overheard them mumble something about "a gym shoe with some blood on it." The detectives then closed the door and left.

Later, defendant, still handcuffed, had a conversation with Nitsche. Nitsche asked defendant what he knew about the murder and told defendant they had shoes belonging to him which had blood

on them. According to defendant, Nitsche stated, "We know you have been through this already, we have the gym shoes; they have blood on them; tell me what you know about them. We know you did it." Nitsche showed defendant the shoes, and he recognized them. Defendant said he did not know what they were talking about. Nitsche responded, "Come on, you can tell me about it, I know you did it." Defendant again refused to say anything. According to defendant, Nitsche "kept carrying on for twenty to thirty minutes with the same conversation over and over so I got tired of it so I told him come on, whatever you wanted me to sign I would do it, I'm tired of it." He did not give a statement immediately at that point. Nitsche then left the room and did not return for several hours. Defendant stated that he had not slept at all that night. Neither Nitsche nor any other officer physically harmed defendant.

When Nitsche returned, he read defendant his rights, talked to him and then took him to see an assistant State's Attorney. The assistant State's Attorney read defendant his rights and defendant then gave a confession in the presence of a court reporter. Defendant did not ask to use the telephone or to have a lawyer present. He testified, however, that he was under the influence of marijuana and beer at the time he gave his formal statement even though it had been at least 12 hours since he had access to either.

Defendant stated that none of the officers asked him if they could search his bedroom. Cummings asked him where he slept and he said in the basement of his parents' house. The detectives then told him they were going to check out his alibi and left.

On cross-examination, defendant stated that he knew before he went to the police station that the police wanted to talk to him about the deceased's murder. Defendant did not recall whether the detectives advised him of his rights when he first arrived, but he did remember Nitsche and the assistant State's Attorney advising him of his rights prior to him giving the oral and written statements.

In response to defendant's motion, the trial court issued a 12-page written order on February 15, 1991. The court found defendant's testimony to be incredible where it conflicted with that of the police. The court, however, believed the testimony of defendant's parents over that of the detectives on the issue of whether the detectives told them, falsely, that defendant was cooperating with the police and had given them permission to search his room. It was primarily on this basis that the court held that the house had been illegally searched and the shoes and drawing illegally seized. The trial court granted defendant's motion to suppress the items at trial.

The court determined that defendant's arrest did not occur until

shortly after 8 a.m. when he began to tell Nitsche the facts surrounding the murder. It was at this point, the court concluded, that the police acquired probable cause. In determining the time of the arrest, the court gave great weight to the fact that defendant came voluntarily to the police station knowing the police wished to speak with him about the deceased's murder, agreed to speak with police, gave a phony alibi, and knew that Boylan and Cummings left the station to check out his alibi. The court also found significant the fact that he was never told he could not leave the station. Finally, the court placed great importance on its finding that defendant never testified that he believed he was not free to leave. (This latter finding, however, was erroneous because defendant did in fact so testify.) The court found that under the totality of the circumstances, a reasonable man would not conclude that he was not free to leave the police station between 3:30 a.m. and 8 a.m.

The trial court denied defendant's motion to suppress his confession statements, after finding that the statements were not obtained by exploitation of the unconstitutional search and seizure or by exploitation of an unlawful arrest. Rather, the court found that defendant's confession was induced by his learning his alibi did not check out.

At trial, the State called a number of witnesses, including Cummings. Cummings testified that he and Boylan interviewed defendant at the station at approximately 12:30 a.m. on June 10 as part of their investigation of the murder. Cummings and Boylan asked defendant several questions, which he answered. Defendant told the detectives that he had last seen the deceased around 3 or 3:30 p.m. on June 8. She was supposed to come to his house at approximately 4:45 p.m. that day but never showed up. When she did not show up, defendant went next door to his cousin's house, where he remained until 7 p.m. After that, he took a bus to his brother's house, where he remained until approximately 3 a.m. the next day, June 9.

In an attempt to verify defendant's story, Cummings and Boylan spoke with his brother Ricky, who had driven defendant to the station and remained there while defendant was being questioned. They asked him whether he had seen his brother on June 8 and 9. Later, they drove to Ricky's home, where they questioned his wife as to whether she had seen defendant on June 9. Cummings and Boylan then went to defendant's house and questioned his mother.

At approximately 3 or 4 a.m., Cummings and Boylan returned to the station. According to Cummings, they did not speak with defendant again because he was asleep.

Nitsche also testified for the State, and his testimony was

substantially similar to that given at the hearing on the motion to suppress. At the end of his testimony, Nitsche read aloud the contents of defendant's court-reported statement. The trial court subsequently found defendant guilty of armed violence and murder.

Defendant contends that his inculpatory statements should have been suppressed because they were brought about by exploiting the illegal search of his house and seizure of his gym shoes. Defendant argues that the police induced his confession by confronting him with their knowledge of the shoes, which they told him were stained with human blood. The trial court disagreed, holding that defendant's confession was a product of his own free will and was sufficiently attenuated from the illegal search and seizure so as to be purged of its taint. In so holding, the trial court placed almost exclusive reliance on the fact that defendant first learned of the bloody shoes at 3:30 a.m. and did not confess at that time. The court reasoned that defendant's failure to confess when first confronted with the knowledge of the illegally seized evidence at 3:30 ruled out any possibility that it induced him to later confess at 8 a.m. In its order, the court concluded:

"We know that the defendant knew of the seizure before Boylan and Cummings spoke to him around 3:30 A.M. And if [defendant] had confessed at that time, no other reasonable interpretation could be made except that the confession came about because of confronting the defendant with the knowledge gained by the illegal search and seizure. But, that did not happen. [Defendant] did not confess then.

\* \* \*

There is no evidence that Boylan and/or Cummings told [defendant], at 3:30, that his alibi did not wash. The only evidence is that this fact was related to him for the first time at 8:00 A.M. when Nitsche spoke to [defendant]. At that same time, the fact that the blood covered gym shoes had been seized was also related to defendant, but, it is reasonable to conclude that since knowledge of the gym shoes didn't induce a confession at 3:30, it was not the inducement that brought about the confession at 8:00 A.M. The only inducement remaining is that [defendant] confessed after learning his brother and sister-in-law did not back up his alibi."

On appeal, the State urges this court to affirm the trial court's finding that the connection between the illegal search and seizure and defendant's later inculpatory statements was sufficiently attenuated.

At the outset, we note that a reviewing court will not disturb the trial court's rulings or factual findings on a motion to suppress unless

they are against the manifest weight of the evidence. (*People v. Booker* (1991), 209 Ill. App. 3d 384, 568 N.E.2d 211.) In determining the propriety of the trial court's denial of a motion to suppress, the reviewing court is free to look to the trial testimony as well as the evidence presented at the hearing on the motion to suppress. (*People v. Stewart* (1984), 104 Ill. 2d 463, 473 N.E.2d 1227.) We are mindful that it is the trial court's duty to resolve conflicts in the evidence and to judge the credibility of witnesses (*People v. Fauntleroy* (1991), 224 Ill. App. 3d 140, 586 N.E.2d 292), and accordingly we will not substitute our judgment for that of the trier of fact as to these issues, absent palpable error. *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984.

After carefully reviewing the record, we must conclude that the trial court manifestly erred in denying defendant's motion to suppress his confession statements because the factors underlying its ruling are not supported by the evidence. That defendant, as the trial court found, had an opportunity to confess at 3:30 a.m. after learning of the shoes, but did not, is not borne out by the record. Accordingly, the trial court's reasoning that "since knowledge of the gym shoes didn't induce a confession at 3:30, it was not the inducement that brought about the confession at 8:00 A.M." must be rejected.

To support the above reasoning, the trial court relied on the testimony of Boylan, who stated that when he and Cummings returned to the station at 3:30 a.m. after searching defendant's bedroom and seizing his shoes, they interviewed defendant and he offered no information about the murder. The trial court inferred from this testimony that the interview occurred after defendant learned the police had his shoes and concluded that, since defendant remained silent about the murder during the interview knowing what he knew about the shoes, his knowledge of the shoes was not the impetus which compelled him to later confess. We do not consider the trial court's inference as to the timing of the interview to be reasonable under the circumstances, because the totality of the evidence indicates that a 3:30 interview with defendant did not, in fact, occur.

Although Boylan testified that the interview took place, he gave no details of the content of that interview other than its duration and the fact that defendant offered no information about the murder. Nowhere else in the record is there any indication as to what was said during that interview. Defendant mentioned nothing about a 3:30 interview in his testimony. He stated only that when the detectives returned to the station several hours later, they looked into the room and he pretended to be asleep. He stated that he noticed something in their hands at this point and overheard them

mumble something about "a gym shoe with some blood on it." According to defendant, the detectives then closed the door and left.

The State argues that it was within the trial court's discretion to disbelieve defendant's testimony, and while that is true, the *absence* of testimony concerning a 3:30 interview is, in our view, relevant to the issue at hand, namely, whether he had an "opportunity" to confess at 3:30 a.m. or whether, as the record tends to indicate, he was left alone until 8 a.m. when the police questioned him for the first time after seizing the bloodstained shoes.

■ Even ignoring defendant's testimony in this regard, other evidence in the record supports a finding that no 3:30 a.m. interview with defendant took place. For instance, while detailing virtually every other aspect of the investigation, including the 12:30 a.m. meeting with defendant on June 10, the interviews of defendant's brother and sister-in-law, the visit to defendant's house at 2:30 a.m., and defendant's 8 a.m. interview with Nitsche and then with the assistant State's Attorney, the written police reports make no mention of a 3:30 a.m. interview with defendant. The only 3:30 a.m. activity discussed was the delivery of the shoes to the crime lab for testing. According to the reports, the first time defendant was confronted by the police after he learned of the bloodstained shoes was at 8:50 a.m., when "Det. Nitsche and Sgt. Wilson confronted [defendant] with the facts that *** the stains on his shoes were human blood and that *** his alibi was not substantiated."

Perhaps most enlightening is the trial testimony of Cummings, Boylan's partner. Cummings testified as follows:

"MR. KOIVUN [Defense counsel]: Detective Cummings, you interviewed the defendant on two occasions on the morning of the 10th?

\* \* \*

CUMMINGS: I thought we just interviewed him the one time.

MR. KOIVUN: Just the one time?

CUMMINGS: Yes.

MR. KOIVUN: That was approximately what time of the morning?

CUMMINGS: It was after midnight, probably about 12:30.

MR. KOIVUN: Okay. After you *** talked to [defendant's brother and sister-in-law], and had gone to the defendant's parents' house, did you have an occasion to talk to or attempt to interview the defendant again?

\* \* \*

CUMMINGS: I don't remember that we talked to him at all after that.

\* \* \*

MR. KOIVUN: So, to the best of your recollection, you *** did not interview [defendant] for the second time, any time after that initial interview?

CUMMINGS: I don't believe I did, no.

MR. KOIVUN: Did you ever indicate to the defendant after checking out or speaking to [defendant's brother and sister-in-law], did you ever speak to him about the alibi he had given?

CUMMINGS: I don't believe we talked to him. When we came back to him, he was asleep, when we came back to the office.

* * *

MR. KOIVUN: *How about Detective Boylan? Did Boylan say anything to him?*

CUMMINGS: *I don't believe he did. I can [sic] say for positive. I was with Boylan most of the time, but I don't think he did, because we had commented about how he was asleep.*" (Emphasis added.)

As the foregoing demonstrates, the manifest weight of the evidence reveals that Boylan and Cummings did not in fact speak with defendant at 3:30 a.m. Accordingly, we must reject the trial court's factual finding that "the defendant knew of the seizure before Boylan and Cummings spoke to him around 3:30 a.m." Relying on this finding, the trial court concluded that had defendant confessed at that time, "no other reasonable interpretation could be made except that the confession came about because of confronting the defendant with the knowledge gained by the illegal search and seizure." If, as the evidence indicates, the first interview following the revelation of the illegal evidence did not occur until 8 a.m. when defendant was confronted with the shoes as well as the fact that his alibi did not check out, then the first "opportunity" for defendant's knowledge of the gym shoes to induce a confession was not at 3:30 a.m., but at 8 a.m.

The State argues that it was the knowledge that his alibi proved to be false which induced defendant to confess to the murder at 8 a.m. While that knowledge may have played a part in defendant's decision to confess, it is probable that his knowledge that the police recovered his bloodstained shoes also played a part. In the past, we have indicated that if a defendant's knowledge that illegally seized evidence was recovered *may* have been a factor in his decision to confess, then suppression is proper. (*People v. Nash* (1979), 78 Ill. App. 3d 172, 397 N.E.2d 480; see also *People v. Rodriquez* (1967), 79 Ill. App. 2d 26, 223 N.E.2d 414.) As a general rule, "[c]onfronting a suspect with evidence tends to induce a confession by demonstrating the futility of remaining silent." *People v. Robbins* (1977), 54 Ill. App. 3d 298, 305, 369 N.E.2d 577.

■ The State attempts to distinguish *Robbins, Nash* and *Rodri-*

*quez,* in our view unsuccessfully, and argues that we should affirm the trial court's finding of attenuation on the basis of the four-prong analysis set forth in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254. In *Brown,* the Supreme Court held that the question whether a confession has been obtained by exploitation of some prior illegal police action (in that case, an illegal arrest) depends upon all the facts of each case. Among the factors which must be considered are: (1) whether the *Miranda* warnings were given, (2) the temporal proximity of the primary illegality and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. (*Brown,* 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62.) Once a defendant establishes the illegality of the police conduct and shows its connection to what is alleged to be the fruit of that illegality, the State has the burden of proving by clear and convincing evidence that the challenged evidence—in this case, defendant's inculpatory statements—was obtained by means sufficiently distinguishable to be purged of the primary taint. (*People v. Graham* (1991), 214 Ill. App. 3d 798, 573 N.E.2d 1346.) The State contends that it has met this burden here.

■ It is undisputed that defendant received *Miranda* warnings prior to confessing to the murder. The giving of *Miranda* warnings, however, does not alone and *per se* purge the taint of an illegal seizure. *Graham,* 214 Ill. App. 3d at 813, 573 N.E.2d at 1355; *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.

●4 As to the temporal proximity factor, the record indicates that approximately $5^1/_2$ hours elapsed between the "primary illegality," that is, the illegal search and seizure, and the defendant's confession, and $4^1/_2$ hours elapsed from the time defendant learned of the illegally seized shoes. The State argues that "[s]ince defendant learned of the seizure at 3:30 a.m., but did not confess to murder till after 8 a.m., enough time passed to indicate the illegal activity did not cause defendant to confess." The fact that defendant did not confess until 8, however, is only significant if, as discussed above, he had an opportunity to confess earlier but did not, notwithstanding his knowledge of the illegally obtained evidence. Thus, in this context, the mere passage of time between the illegal search and seizure and the confession does not by itself, or in conjunction with the giving of *Miranda* warnings, purge the taint of the illegality.

As is often the case in the context of a confession following an illegal arrest, the key in determining whether the passage of time has purged the taint of illegal police conduct is to examine what, if any, intervening events occurred during that time and the nature of those events. (*People v. Stofer* (1989), 180 Ill. App. 3d 158, 534 N.E.2d 1287.)

The same can be said in this context, where the confession follows an illegal search and seizure of property.

■ An intervening circumstance is one that dissipates the taint of the unconstitutional police conduct by breaking the causal connection between the illegal conduct and the confession. The confrontation of a suspect with new information, untainted by the illegality, has been identified as an intervening circumstance that may produce a voluntary desire to confess and thereby support the admission of a confession. (*People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221.) The trial court found that defendant's confession was induced with such "new information," namely, the knowledge that his alibi did not check out. For the reasons set forth above, however, we do not agree. As the evidence indicates, the first confrontation between defendant and the police after defendant learned of the shoes was shortly after 8 a.m., when Nitsche also informed him that his alibi did not check out. As defendant correctly points out, for the alibi to be an intervening circumstance, the State must prove that it was solely the unsubstantiated alibi which led to the confession and that being confronted with the illegally obtained evidence did not enter into defendant's decision to confess. We do not believe the State has met this burden. Indeed, the trial court itself acknowledged that had defendant confessed to the murder during questioning by police at 3:30, after learning of the shoes, then "no other reasonable interpretation could be made except that the confession came about because of confronting the defendant with the knowledge gained by the illegal search and seizure." Since such questioning did not occur until later that morning, at 8, and since defendant did in fact confess to the murder then, we can reasonably presume that defendant's knowledge of the shoes played a factor in his decision to confess at the first opportunity to do so following the illegal seizure.

■ As to the final *Brown* factor, the purpose and flagrancy of the police conduct, the State relies heavily on the fact that the police did not use force to obtain the evidence. It also relies on the fact that "[a]ny flagrant conduct which did exist was directed toward another, not the defendant." To our knowledge, however, the show of force is not a *sine qua non* to a finding of flagrancy or purposefulness. In our view, the deceit displayed by the police to secure the illegal evidence from defendant's house in the middle of the night constitutes a certain degree of flagrancy. Indeed, their conduct was sufficient for the trial court to suppress the seized evidence at trial. Moreover, although the State does not discuss the purposefulness of the police conduct, it is apparent to us that the police, in going to defendant's house at 2:30 a.m., were on an expedition for incriminating evidence

to be used against defendant. No other reason for the visit to defendant's house at that time of day has been suggested by the State. Nor has the State offered an explanation as to why the police even confronted defendant with their knowledge of the bloodstained shoes, or why they told him additional tests were being conducted to determine whether the blood found on the shoes matched that of the deceased. There can be no reasonable explanation, in our view, other than that the officers intended for these statements to induce a confession, thereby establishing the probable cause necessary to effectuate defendant's arrest.

In view of the foregoing, we conclude that defendant's inculpatory statements were not obtained by means sufficiently distinguishable from the illegal search of his house and seizure of his shoes as to be purged of the taint arising from that illegality. (See *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) The totality of the evidence indicates that the police exploited the "fruits" of the illegal search and seizure to force a confession from defendant. Under these circumstances, we hold that the State has failed to meet its burden of proving, by clear and convincing evidence, that defendant's confession was a product of his free will, independent of the taint of the illegal search and seizure. (*Lekas*, 155 Ill. App. 3d at 411, 508 N.E.2d at 235; see also *Wong Sun*, 371 U.S. at 486, 9 L. Ed. 2d at 454, 83 S. Ct. at 416-17.) Accordingly, defendant's inculpatory statements must be suppressed.

In light of our holding, we need not address defendant's additional contention that his statements should have been suppressed as the products of an unlawful arrest.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

EGAN, P.J., and GIANNIS, J., concur.