Rockingham
No. 2008-323

THE STATE OF NEW HAMPSHIRE

v.

SEAN MILLER

Argued: February 19, 2009
Opinion Issued: July 31, 2009

*Kelly A. Ayotte*, attorney general (*Stephen D. Fuller*, senior assistant attorney general, on the brief and orally), for the State.

*Paul Borchardt*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DALIANIS, J. The defendant, Sean Miller, appeals his conviction of one count of theft by unauthorized taking, following a bench trial. *See* RSA 637:3 (2007). On appeal, he contends that the Trial Court (*Nadeau*, J.) erred by denying his motion to suppress statements he made to the Deerfield police. We reverse and remand.

The trial court found or the record supports the following facts. On April 24, 2007, the Concord Police Department received a telephone call from an individual reporting that a car with several people inside it as well as people going to and from it had been parked in front of his residence for

approximately ten minutes. The caller expressed concern because his neighbor had recently been burglarized. At approximately 9:30 p.m., Concord Police Officer Levesque arrived at the residence and observed that the car appeared to have four occupants. When the car began to move away, Levesque activated his blue lights and stopped it.

Levesque asked the defendant, who was driving, if he knew why he had been stopped. The defendant responded that he did not. Levesque then informed him that someone had reported that his car had been parked in front of a residence for a "long period of time." Levesque asked the defendant his reason for parking on the street. The defendant and a juvenile passenger, J.H., explained to the officer that J.H.'s younger brother had been in a fight and was in the emergency room and that the car occupants had been investigating what had happened. Levesque asked J.H. if he and the other occupants intended to exact revenge from the individual who hurt his brother, and J.H. responded that they did not. Levesque asked the defendant if there was anything in the car he should know about, including weapons, drugs, or alcohol. The defendant responded, "No." Levesque then told everyone to remain in the car, and proceeded to check the defendant's license. Officer Reed, also of the Concord Police Department, then arrived on the scene.

Once the defendant's license was cleared by police dispatch, Levesque returned to the car and asked the defendant to get out. He again asked why the defendant was in the neighborhood and whether the defendant had any weapons on him. The defendant responded that he did not. Levesque patted the defendant down and found no weapons. He told the defendant that he was suspicious of his explanation because the emergency room had not reported any recent assault victims to the police. Levesque asked whether he could search the defendant's car. The defendant refused, stating that he had done nothing wrong. Levesque then told the defendant to remain with Reed and he returned to the car to speak with the other occupants.

Levesque asked the other juvenile passenger, J.O., to get out of the car. While asking J.O. for his name and date of birth, Levesque noticed that his hands were in the pocket of his sweatshirt. He asked J.O. to remove his hands and inquired whether he had any weapons on him. When J.O. failed to answer, Levesque performed a pat-down search and discovered a loaded nine millimeter handgun in his waistband. Levesque then asked the defendant whether he was aware that J.O. had a gun. The defendant admitted that there was another gun under the driver's seat. Upon a subsequent search of the car, the gun was found.

The defendant was taken to the Concord police station, where he was fingerprinted, booked and classified. He was held in a cell for approximately thirty minutes and then taken to an interrogation room where he was read

his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), which he waived. The defendant was questioned by three police officers, including Levesque, who asked him where he had obtained the gun. The defendant confessed that he stole the gun from a Deerfield residence. The Concord police notified the Deerfield police of the defendant's statement and informed him that a Deerfield police officer would be coming to speak with him.

Officer Joel Hughes of the Deerfield Police Department arrived at the Concord police station at approximately 1:00 a.m. The defendant was still in the interrogation room, having remained there after he confessed to the Concord police. The Concord police told Hughes that the defendant had been read and had waived his *Miranda* rights. Hughes again read the defendant his *Miranda* rights, and the defendant again waived them. Hughes questioned the defendant with the three Concord police officers present. Hughes asked if the defendant knew why Hughes was interviewing him. The defendant replied, "[Y]eah, because I stole the gun." Hughes asked the defendant if Hughes' gun looked like the one stolen from Deerfield. The defendant responded that it did, and he told Hughes how he had removed the gun from Deerfield Police Officer Glenda Smith's holster while she was away from her home.

A Rockingham County grand jury indicted the defendant for one count of theft by unauthorized taking. *See* RSA 637:3. Before trial, the defendant moved to suppress statements he made to Hughes. The trial court denied his motion.

The defendant argues that the trial court erred in denying his motion to suppress statements he made to Hughes because they were fruits of an unlawful search and illegal arrest. *See* U.S. CONST. amend IV; N.H. CONST. pt. I, art. 19. The State concedes the defendant's arrest was illegal and that the resulting evidence from his car should be suppressed, but contends that his confession to Hughes is admissible because "the act of giving the statement was sufficiently a product of the defendant's free will so as to break the causal connection between the illegality and the confession." *State v. Gotsch*, 143 N.H. 88, 90 (1998), *cert. denied*, 525 U.S. 1164 (1999) (quotation omitted). In addition, the State contends that the defendant's claim was not preserved for appeal.

We first address the State's argument that the defendant failed to preserve the issue of whether his confession was the fruit of an illegal search. Upon reviewing the record, we conclude that this argument lacks sufficient merit to warrant further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993). We now turn to the defendant's constitutional claim.

Our review of the trial court's order on the motion to suppress is *de novo*, except as to any controlling facts determined by the trial court in the first instance. *State v. Cowles*, 152 N.H. 369, 371 (2005). We first address the

defendant's arguments under the State Constitution and reference federal cases only to aid in our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

▮ In determining whether a confession following an illegal arrest is voluntary, and, thus, admissible under our constitution, we balance the following four factors: (1) whether *Miranda* warnings were given; (2) the temporal proximity of the arrest and confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct." *Gotsch*, 143 N.H. at 90. No single factor is determinative. *See Brown v. Illinois*, 422 U.S. 590, 603 (1975); *People v. Rodriguez*, 945 P.2d 1351, 1364 (Colo. 1997); *Wilkins v. State*, 960 S.W.2d 429, 432 (Tex. App.), *petition for review denied* (1998). "The question of attenuation inevitably is largely a matter of degree and thus application of the test is dependent upon the particular facts of each case." 6 W. LAFAVE, SEARCH AND SEIZURE § 11.4(b), at 259 (4th ed. 2004) (quotations omitted). The State has the burden of showing that the confession was admissible. *State v. White*, 119 N.H. 567, 570 (1979).

The first factor favors admissibility; the defendant was read his *Miranda* rights twice, first by a Concord police officer and then by Hughes. *See State v. Belton*, 150 N.H. 741, 748, *cert. denied*, 543 U.S. 1028 (2004).

▮ Under the second factor, we consider whether sufficient time elapsed between the illegal conduct and the subsequent confession. *Gotsch*, 143 N.H. at 90. Generally, this factor is considered independently of other factors and "the longer the time between the unlawful arrest and the confession, the more likely the taint has been attenuated." *Cowles*, 152 N.H. at 372. For example, in *Gotsch*, we cited with approval a case in which a three-hour time period was enough to attenuate a defendant's illegal arrest and subsequent confession. *Gotsch*, 143 N.H. at 91; *see Oliver v. United States*, 656 A.2d 1159, 1173 (D.C. 1995).

However, we have also noted that "the span of time, by itself, is not determinative of admissibility." *Cowles*, 152 N.H. at 372. For instance, "a lengthy delay may be found to have exacerbated the taint because if there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one." *Id.* (quotation, citation and brackets omitted).

▮▮ "[I]n practice the temporal proximity factor has not itself been at all significant as far as influencing a finding that the taint of the illegal arrest was dissipated." LAFAVE, *supra* § 11.4(b), at 291. As one commentator has explained:

In the absence of any intervening circumstances, the temporal proximity of the arrest and confession should have little influence on the confession's admissibility. Where the defendant remains in custody and has neither been taken before a magistrate nor met with counsel, no reason exists for admitting a later confession since the causal chain between the illegal arrest and confession has not been broken. When the confession occurs in close proximity to the illegal arrest, it clearly should be excluded on the basis of *Brown* . . . . If the defendant is illegally detained for a considerable length of time, without any intervening circumstances, another fourth amendment consideration should operate to exclude the confession. . . . Thus, the absence of any intervening circumstances should mandate exclusion of the confession on either of two theories, reducing the temporal element to a position of nonconsideration.

Comment, *The Fourth Amendment and Tainted Confessions: Admissibility as a Policy Decision*, 13 HOUS. L. REV. 753, 770-71 (1976); *see* LAFAVE, *supra* § 11.4(b), at 291. Thus, "[a]s is often the case in the context of a confession following an illegal arrest, the key in determining whether the passage of time has purged the taint of illegal police conduct is to examine what, if any, intervening events occurred during that time, and the nature of those events." *People v. Turner*, 631 N.E.2d 1236, 1245 (Ill. App. Ct.), *appeal denied*, 642 N.E.2d 1299 (Ill. 1994), *cert. denied*, 513 U.S. 1136 (1995); *see United States v. Shaw*, 464 F.3d 615, 628 (6th Cir. 2006).

"An intervening circumstance is one that dissipates the taint of the unconstitutional police conduct by breaking the causal connection between the illegal conduct and the confession." *Turner*, 631 N.E.2d at 1245; *see United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003). The United States Supreme Court has not defined what constitutes an intervening event. Other courts have held that intervening events include a subsequent arrest on unrelated charges following the initial illegal arrest, *see United States v. Green*, 111 F.3d 515, 521 (7th Cir.), *cert. denied*, 522 U.S. 973 (1997), a defendant's "subsequent release from custody, an appearance before a magistrate, consultation with a lawyer, [or] subsequent convictions on unrelated charges," *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1300 (9th Cir. 1988); *see* LAFAVE, *supra* § 11.4(b), at 296-97 (citing cases).

Here, we conclude that there were no significant intervening events that broke the causal connection between the illegal arrest and the defendant's second confession. The defendant confessed to Hughes approximately three and one-half hours after he was arrested. The defendant

was either alone or in police custody that entire time. He did not consult with counsel or appear before a magistrate, nor was there any other circumstance that would have attenuated the taint from the illegal arrest. Accordingly, we conclude that both the second and third factors favor suppression of the confession.

The Texas Court of Appeals came to a similar conclusion in *Black v. State*, 762 S.W.2d 192, 194 (Tex. App. 1988), *petition for review denied* (1989), concluding that the six and one-half hours that passed between the defendant's illegal arrest and subsequent confession were not enough to attenuate the taint of the illegal conduct. Rather, the court considered the circumstances of the defendant's confinement and found that "there was no point in time that [the defendant] was not either: (1) being interrogated; (2) having his home and car searched; or (3) being transported to another location for further questioning." *Black*, 762 S.W.2d at 194. The court further noted the defendant was never taken before a magistrate and never consulted an attorney. *Id.* Thus, looking at the second and third factors together, the court concluded that both supported suppression of the confession. *Id.*

The State argues that the second interrogation by a law officer from a different law enforcement agency constitutes an intervening circumstance that attenuated the taint of the defendant's illegal arrest, relying upon *Gotsch*, 143 N.H. at 91. The State's reliance upon *Gotsch* is misplaced.

In *Gotsch*, the defendant was illegally arrested by police officers in Poughkeepsie, New York, after New Hampshire authorities had notified other police departments that he was a suspect in a murder investigation. *Gotsch*, 143 N.H. at 89. After receiving *Miranda* warnings and waiving them, the defendant confessed to police that he had killed his father. *Id.* After the defendant stated that he felt uncomfortable in the interview room, he was taken to a larger air-conditioned room that was furnished with, among other things, a leather recliner and a television set. *Id.* He was also given pizza. *Id.* Three and one-half hours later, New Hampshire authorities arrived to interrogate him. *Id.* When questioned by the New Hampshire police outside of the presence of Poughkeepsie officers and after having been given *Miranda* warnings, which he again waived, he confessed to killing his father. *Id.* at 89-90.

We determined that the "the improvement of the defendant's conditions of confinement and the interview of the defendant by a different law enforcement agency" were "sufficient, in combination with the other three factors, to break the causal chain between the defendant's illegal arrest and his statements" to New Hampshire authorities. *Id.* at 91.

■ Here, there were no such improvements in the defendant's confinement that would eliminate the taint of the illegal arrest. He remained either alone or in the presence of police for the duration of his confinement. Further, unlike the second interrogation in *Gotsch*, the defendant's second interrogation was conducted in the presence of all three of his initial interviewers and was conducted less than an hour after and in the same room as his first confession. Based upon these circumstances, the second interrogation was insufficient to constitute a significant intervening event. *See Friend v. State*, 865 S.W.2d 275, 279 (Ark. 1993) (taint of illegal arrest not attenuated when "both the delay and the intervening circumstance occurred while [defendant] was in continuous custody of the law"). Thus, we turn to the fourth and final factor.

■ In analyzing the last factor, we do not merely consider whether the police committed misconduct, but, rather, whether the misconduct at issue was flagrant and purposeful. "In analyzing this factor, courts look to see whether: (a) the police used threatening or abusive tactics; (b) the impropriety of the initial misconduct was obvious; and (c) the initial [misconduct] was . . . calculated to elicit a confession." *United States v. Stark*, 499 F.3d 72, 77 (1st Cir. 2007) (quotation and brackets omitted).

Examples of such misconduct include arrests "made without any apparent justification, as a part of a dragnet operation, or upon a pretext" or when the defendant was arrested "for the purpose of obtaining a confession and the arrest was exploited for that purpose." LAFAVE, *supra* § 11.4(b), at 293-94 (quotation omitted). Courts are less likely to suppress a confession where the illegality of an arrest was not flagrant, such as an arrest slightly short of probable cause after a lawful stop for investigation, an arrest made in reliance upon an arrest warrant later determined to be invalid, or an arrest based upon evidence that would be sufficient but for its acquisition during a stop for investigation on grounds barely insufficient. *Id.* at 294.

For instance, in *Brown*, 422 U.S. at 603, the defendant was arrested "solely on the basis of an unsubstantiated tip which identified [him] only as an acquaintance of a murder victim." *Self v. State*, 709 S.W.2d 662, 667 (Tex. Crim. App. 1986). "He was not a suspect at the time." *Id.* "The officer broke into [the defendant's] apartment, searched it, and when [the defendant] was climbing the stairs to his apartment, he was accosted by three plainclothes officers pointing guns at [him]." *Id.* "This was without warrant or probable cause." *Id.* "The officers later testified they arrested [the defendant] for the purpose of questioning him as part of their murder investigation." *Id.* "He was arrested and taken to the police station, where he gave a confession." *Id.*

In determining that the officers' conduct had been flagrant and purposeful, the United States Supreme Court reasoned that the "illegality . . . had a quality of purposefulness." *Brown*, 422 U.S. at 605. "The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or 'for questioning.' " *Id*. "The arrest, both in design and in execution, was investigatory." *Id*. "The detectives embarked on [the] expedition for evidence in the hope that something might turn up. The manner in which [the defendant's] arrest was effected gives the appearance of having been calculated to cause surprise, fright and confusion." *Id*.

▉ Here, we agree with the trial court that the initial police misconduct was not flagrant and purposeful. It was not "the kind of willful or purposeful misconduct that the exclusionary rule was fashioned to deter." *Gotsch*, 143 N.H. at 91-92 (quotation omitted). Even though Levesque's expansion of the scope of the stop was improper, his conduct did not "appear [to have] been calculated to cause surprise, fright, and confusion," nor did it appear to have "a quality of purposefulness." *Brown*, 422 U.S. at 605.

Instead, the misconduct in this case is similar to that in *United States v. Thomas*, 83 F.3d 259, 259, 260 (8th Cir. 1996), *cert. denied*, 528 U.S. 1066 (1999), in which a defendant was illegally detained after a police officer stopped him for speeding. Even though the officer lacked reasonable articulable suspicion to detain the defendant, the court concluded that the officer's conduct was neither purposeful nor flagrant misconduct. *Thomas*, 83 F.3d at 260. The court reasoned that the officer "had some suspicion that criminal activity was afoot, and the violation . . . was not flagrant." *Id*. Similarly, we conclude that the expanded stop here was not a flagrant and purposeful violation of the defendant's constitutional rights.

The defendant argues that it was flagrant and purposeful for the Concord police to interrogate him and obtain a confession before he was interrogated by Hughes. To the contrary, neither the Concord interrogation nor Hughes' interrogation of the defendant would qualify as police misconduct. The defendant does not contend that the police coerced him in any way. He testified that he was not forced into making a statement and that he spoke to the police of his own free will. In fact, Hughes testified that the defendant was "[v]ery open" and had "fun" while describing how he stole the gun, so much so that Hughes "was taken aback at how comfortable he was."

This is a close case, with two factors weighing in favor of suppression and two in favor of admission. We conclude on the facts of this case that the second and third factors deserve greater weight than the first and fourth

factors. *See United States v. Pena*, 924 F. Supp. 1239, 1253 (D. Mass. 1996); *State v. Miller*, 894 S.W.2d 649, 656 (Mo. 1995) (en banc) ("the absence of purposeful and flagrant misconduct cannot alone dissipate the taint in the complete absence of temporal distance and intervening circumstances"); *Williams v. State*, 937 S.W.2d 23, 37 (Texas Crim. App. 1996) ("Otherwise inadmissible evidence should not be made admissible simply because the police misconduct was not too reprehensible."), *petition for review denied* (1997). In doing so, we adopt the reasoning of the Illinois Appellate Court, in *People v. Vought*, 528 N.E.2d 1095 (Ill. App. Ct. 1988), *appeal denied*, 535 N.E.2d 920 (Ill.), *cert. denied*, 492 U.S. 911 (1989), a case with marked similarities to this case.

In *Vought*, the defendant's guestroom at a hotel was subjected to an illegal search after housekeeping staff found a briefcase containing cocaine, and the hotel manager called the police and, believing the room to be unoccupied, consented to a search of his room. *Vought*, 528 N.E.2d at 1096-97. The defendant initially stated that the briefcase was not his, but then confessed four hours after the arrest. *Id.* at 1097. The court determined that, under *Brown*, the defendant's confession should be suppressed, despite the fact that *Miranda* warnings had been given and the police misconduct was not flagrant. *Id.* at 1101-02.

The *Vought* court reasoned that there had been "no intervening circumstances between the entry and the statements to indicate that they were sufficiently an act of free will to purge the primary taint of the illegal invasion." *Id.* at 1101. It further reasoned that although "the police misconduct was not flagrant, the nature of that misconduct must be considered as well." *Id.* Since the police had illegally obtained evidence with which they were able to confront the defendant, it was likely that they "induce[d] a confession by demonstrating it [was] futile to remain silent." *Id.* at 1102. Thus, "it was most probable that [the] defendant confessed only because he was caught red-handed." *Id.* Accordingly, there was no break in the causal connection between the illegal search and the subsequent confession to purge the taint. *Id.*

Similarly, we conclude that the nature of the defendant's arrest and the circumstances of his confinement are crucial to this analysis. The defendant was either alone or in the presence of police officers for the entire period during which he was confined. Hughes questioned the defendant about the illegally obtained gun, which, in all probability, induced him to confess. Most importantly, Hughes interrogated him in the same room as had the Concord police and with the Concord police present. The defendant testified that part of the reason he spoke to Hughes was that he had already spoken to the Concord police officers.

These circumstances suggest that the defendant found it futile to refuse to speak to Hughes or to say anything different from what he had told the Concord officers. *See Brown*, 422 U.S. at 605 n.12 ("The fact that [the defendant] had made one statement, believed by him to be admissible, . . . bolstered the pressures for him to give the second, or at least vitiated any incentive on his part to avoid self-incrimination.").

For the foregoing reasons, we conclude that, after balancing the *Gotsch* factors, those favoring suppression outweigh those favoring admission. Because we conclude that admitting the defendant's confession violated the State Constitution, we need not reach the federal issue. *See Ball*, 124 N.H. at 237.

*Reversed and remanded.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.