THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SVONDO WATSON, Defendant-Appellant.

Second District   No. 2—98—1125

Opinion filed July 20, 2000.—Modified on denial of rehearing August 22, 2000.

Eric Gibson and Robert Rattler, both of Law Office of Eric Gibson, of Oak Park, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE THOMAS delivered the opinion of the court:

After a jury trial, the defendant, Svondo Watson, was convicted on July 29, 1998, of first-degree murder, attempted first-degree murder and aggravated battery. The trial court sentenced him to a term of imprisonment of 60 years for the murder conviction, 30 years for the attempted murder conviction, and 30 years for the aggravated battery conviction. The 30-year sentences were to run concurrently with each other but consecutive to the 60-year sentence. The defendant appeals his convictions, contending that the trial court erred in failing to suppress his confessions to the crimes. Specifically, the defendant contends (1) that his confessions were the tainted fruit of evidence that was illegally seized earlier in the day, and (2) that the police denied him access to his attorney in violation of his constitutional rights.

The record reveals that the defendant was initially convicted in this case on June 9, 1996. However, on appeal this court reversed the defendant's convictions and remanded the cause for a new trial, finding that the defendant's trial counsel was ineffective in failing to file a motion to suppress evidence of bullets that were found in a safe in a bedroom closet in the first-floor apartment located at 1628 North

Linder, Chicago, Illinois. See *People v. Watson*, No. 2—95—0809 (unpublished order under Supreme Court Rule 23 (1996)). The building searched was a two-flat building that contained separate apartments on the second floor and first floor, with an additional basement apartment. The search warrant executed by police permitted the officers to search the entire brick, two-story premises at 1628 North Linder in Chicago. However, the complaint requested a search warrant for "the house" that the defendant "was found at in Chicago." The complaint, written in narrative form by Detective Carl Alagna, also stated that the defendant's brother, Changa Harris, told police that if the defendant was going to use a gun it would have been a .380-caliber gun that belonged to the defendant's cousin. According to the complaint, Harris also told police that the defendant's cousin lived at the same house with Harris and the defendant.

This court found that it was apparent from the officers' testimony that at the time they requested the issuance of the warrant they knew or reasonably should have known that the premises consisted of separate living quarters. Additionally, the officers knew that the defendant occupied only the second-floor apartment. Thus, probable cause existed to search on the second-floor apartment, not the first-floor apartment where the incriminating evidence was found.

On remand for a new trial, the defendant filed motions to quash his arrest, to suppress evidence seized pursuant to the execution of the search warrant, and to suppress statements the defendant made to the police following his arrest. At the hearing on the defendant's motions, the State presented evidence indicating that Leo McDaniel was fatally shot while sleeping in his apartment during the early morning hours of June 7, 1997. McDaniel's girlfriend, Keisha Twitty, was present during the shooting and later identified the defendant as the shooter to the police. The defendant had stayed at the apartment the previous couple of nights and was expected to return that night. He had a key to the apartment and was the only other person besides McDaniel and Twitty with a key to the apartment. Twitty specifically remembered locking the door before she went to bed that night, and there was no forced entry. The police found a receipt with the defendant's address in McDaniel's apartment. When the police went to the location mentioned on the receipt, they found a vehicle matching the description of the type of vehicle driven by the defendant. Upon arriving at the defendant's apartment, the defendant told police that "Svondo Watson was not there" and that "Watson had been in jail for the past two weeks." The trial court granted the defendant's motion to suppress items seized during the search but denied the motion to suppress the defendant's arrest.

The hearing then continued on the questions presented by the defendant's motion to suppress the defendant's statements to police following his arrest. Lombard police detective Carl Alagna testified that he arrested the defendant and Changa Harris around 10 a.m. on June 7, 1994, at the defendant's home and brought them to the Lombard police department. Officer Alagna read the defendant his *Miranda* warnings, and the defendant told the officer that he understood each of his rights, including his rights to remain silent and to have an attorney present. The defendant then voluntarily spoke with Alagna for about 25 minutes. Officer Sticka was also present during the conversation. At that time, the defendant denied involvement in the shooting but acknowledged his association with the victim. Alagna did not remember whether he mentioned to the defendant that Twitty had positively identified the defendant as the shooter. However, Alagna further testified that he did not believe that he did mention Twitty's identification to the defendant because he would have placed that fact in the police report if he had mentioned it.

Officer Alagna further testified that he again spoke with the defendant around 3:30 p.m. that same day. Officer Dane Cuny was also present for this conversation. Cuny asked the defendant if he still understood his rights, and the defendant responded that he did. According to Alagna, the defendant did not assert any of his *Miranda* rights while he was present, and Alagna was not advised by anyone that an attorney had called attempting to locate the defendant.

Lombard police lieutenant Dane Cuny testified that he interviewed the defendant at 3:30 p.m. on June 7, 1994, at the Lombard police station. The interview lasted about 10 to 15 minutes. Around 5:30 p.m., Cuny was informed that the defendant wanted to speak with him. When Cuny then went to the interview room, he asked the defendant if he still understood the *Miranda* warnings that had been read to him earlier that day and if he wanted to talk. The defendant replied that he understood his rights and wanted to tell the truth. When the defendant began describing specifics about where he discarded a weapon, Officer Cuny stopped the interview because Cuny wanted to get a notepad and bring another officer into the interview room. About 5 or 10 minutes later, Cuny returned to the interview room with Officer Rick Montalto. At that point, the defendant denied the previous admissions he had made. However, the defendant did not at any time assert any of his *Miranda* rights, including his right to remain silent or his right to consult with an attorney. Cuny further noted that he had not told the defendant that he had been positively identified by Twitty.

Lombard police detective Rick Montalto testified that he and Sergeant Richard Spika took the defendant to the polygraph examin-

ing facility about two or three miles from the police station. They were at the facility for about 30 minutes when they decided to return to the station without having the polygraph test administered because they had received a report that the defendant's brother, Changa Harris, was providing some information to the police. They returned with the defendant to the police station around 2:30 or 2:45 p.m. Officer Montalto did not have any further contact with the defendant until 5:30 p.m., when Officer Cuny asked Montalto to come to the interview room to witness a statement by the defendant. Montalto noted that the defendant recanted the statement he had apparently made to Officer Cuny. Montalto was in the interview room with the defendant for about five minutes. The defendant was then taken to an interview room in the booking area, which was next to the room his brother was in. Between the two rooms was a small two-way mirror and a speaker. The defendant got on the speaker and made some comments to his brother "about giving him up or something to that effect." When Montalto and the other officers heard the comments, they took Harris to a different room.

Officer Montalto further testified that he brought a McDonald's dinner to the defendant around 6:30 p.m. The next time he had any contact with the defendant was around 8:15 p.m., when he went into the interview room to collect the defendant's garbage from dinner and to ask the defendant if he needed to go to the bathroom. When Montalto asked the defendant if he needed to go to the bathroom, the defendant asked Montalto "what was going on." Montalto told the defendant that the only information he had was that "some of our detectives had gone back to the house on Linder and served a search warrant and had recovered a couple of items, not knowing what they were. And then they were on their way back to the station at this point." The defendant then told Montalto that he wanted to talk to him, and the defendant then made an admission with respect to the shooting in question. The conversation between the defendant and Montalto lasted from 8:15 until 8:45 p.m. About 8:45 p.m. Montalto called Officer Spika into the interview room and the defendant reiterated his incriminating statements in the presence of Spika. That conversation ended about 9 p.m. The defendant then requested to speak to Assistant State's Attorney Brian Nigohosian, who had spoken with the defendant earlier in the day. After being paged, Nigohosian arrived at the Lombard police department about 9:20 p.m. According to Montalto, Nigohosian entered through the front door and lobby area of the building because that was the only way to get into the building without a security code. Officers Montalto and Spika then talked with Nigohosian for about 10 minutes about the statements

that the defendant had made. With Officers Montalto and Spika present, Nigohosian then spoke to the defendant until 10 p.m., during which time the defendant again made admissions.

Officer Montalto also testified that around 10 p.m. it was decided that the defendant's statement should be tape-recorded. Montalto and Nigohosian then left the room to find a tape recorder and batteries. While they were looking for batteries, the receptionist in the lobby advised Montalto that an attorney was in the lobby and wanted to speak with the defendant. Montalto immediately told Nigohosian about the attorney, and the defendant was not interviewed any further. This was the first time that Montalto was aware that an attorney for the defendant was at the police station or on the way to the police station. Officer Montalto noted that if a person dialed 911 he or she would receive a dispatch center in Wheaton and not the receptionist at the Lombard station. At any rate, Montalto was also not aware of any phone calls made to the Lombard police station from an attorney that day.

Assistant State's Attorney Brian Nigohosian testified that around 1 p.m. on June 7, 1994, he had a 20-minute conversation with the defendant at the Lombard police station. During the conversation, Nigohosian told the defendant that "[Twitty] had seen him, or words to that effect, and identified him as being the shooter." Later that same day, around 9 p.m., Nigohosian was paged and returned to the Lombard police station. He arrived about 9:20 p.m. and entered through the lobby. At the time, he did not see anyone else in the lobby area, including the defendant's family members. While he was not specifically looking for them, he noted that the lobby is not a very large area.

Nigohosian further testified that, when he arrived at the station, he knew that the police had executed the search warrant and had recovered bullets and a backpack with the defendant's name on it. Nigohosian did not recall talking to the defendant about the items recovered because their conversation dealt mainly with the defendant telling Nigohosian facts and details. Nigohosian's conversation with the defendant in the presence of Montalto and Spika ended about 10 p.m., when the defendant agreed to give a tape-recorded statement. While Nigohosian and the other officers were looking for a tape recorder, Nigohosian was informed that attorney Tod Urban had arrived at the police station to see the defendant. At that point, Nigohosian called his supervisor and then spoke with attorney Urban. Nigohosian then went back to the booking area and informed the defendant that an attorney was at the station to see the defendant. The defendant indicated that he wanted to see the attorney.

Nigohosian noted that there was no further conversation with the defendant after Nigohosian was told that an attorney was present.

Nigohosian was not informed that an attorney had called earlier that day, and the defendant did not request an attorney or assert his right to remain silent at any point. While he was not positive, Nigohosian believed that Urban showed up after the interview with the defendant while the officers were looking for a tape recorder. Nigohosian recalled that when he went into the lobby area after talking with the defendant around 10 p.m. he saw the defendant's family members with attorney Urban.

Lombard police sergeant Richard Spika testified that he became aware around 8:30 p.m. on June 7, 1994, that Sergeant Sticka had executed a warrant at 1628 North Linder. Spika stated that, although he did not remember exactly, he probably was advised of the execution of the warrant by either radio, phone, or a transmission from the front desk. He noted that he never asked what was recovered, and he did not receive any information about what was recovered. Spika stated that, prior to the time that he went into the interview room with Officer Montalto, he told Montalto that Officer Sticka had executed the search warrant and was on his way back to the station. Spika noted that he did not tell Montalto about any specific items recovered because Spika did not know what had been recovered.

Officer Spika further testified that, at around 8:45 p.m. Officer Montalto asked him to witness a statement by the defendant. At the conclusion of the statement, the defendant requested to talk with the assistant State's Attorney. Spika then contacted Nigohosian, and Nigohosian arrived at the station around 9:20 p.m., through the lobby. Officers Spika and Montalto then explained to Nigohosian what had transpired. Nigohosian then interviewed the defendant with the two officers present. When the interview concluded around 10 p.m., Spika left the booking area and within minutes met Officer Sticka coming into the station through the back door of the building with the defendant's mother, Delores Harris, and the defendant's grandmother. They went directly to a conference table in the investigations area. This was an interior part of the station and not part of the lobby. In the presence of the defendant's mother and grandmother, Spika sat at the conference table and counted the money seized during the search. It took about 15 to 20 minutes to count the money. As they finished counting, Officer Spika received a page from the front desk and was advised that attorney Urban was at the station.

Attorney Tod Urban testified that on June 7, 1994, he was in the midst of a trial at the criminal courts building, at 26th and California in Chicago, when he received a message from the defendant's father. Urban spoke over the telephone with the defendant's mother about 1 or 1:30 p.m. Urban told her that he was in the midst of a trial and

would not be able to get there until later. Urban made some phone calls and found out that the defendant was located at the Lombard police department. Urban had some additional matters pending in the criminal courts building at 4 p.m. He finally left for the Lombard police department around 7:30 p.m.

Urban testified as follows with respect to the telephone calls he made that day:

"Q. Prior to going out [to the Lombard police department] did you make any calls to any of the dispatchers or to the dispatcher?

A. I believe I called—One of the times I called I did inform— Honestly I don't recall who I talked to but I did tell someone when I was on my way.

Q. What did you say to the best of your knowledge?

A. That I was an attorney and been retained by the family and I was on my way from 26th Street to the police department.

Q. Did you tell them who you were there to see?

A. Yes.

Q. Who did you say you were there to see?

A. Svondo Watson.

Q. Did you give them any other directions at the time?

A. I don't know what time you are talking about.

Q. When you called the dispatcher.

A. Honestly I cannot say that I did or didn't for sure.

Q. What time did you arrive at the police station.

A. My memory is maybe 8:30, quarter to nine. Somewhere around there."

Urban further testified that he did not get to the Lombard police station until it was dark. When he arrived at the station, the defendant's mother was already there. Urban had a conversation with her when he first walked into the station. Urban then went to the front desk, and, after identifying himself, he asked to see the defendant. Urban stated that he waited "a minimum of probably five minutes and maybe no more than forty-five minutes" before he saw the defendant. Urban claimed that while he waited in the lobby he became very anxious and angry to get in to see the defendant and he went up to the front desk several times. Urban noted that an assistant State's Attorney eventually came out and explained to him that the defendant had just finished making a statement and they were about to record it. This was the first time that Urban had seen that assistant State's Attorney. Urban told the police that there would not be a recording of any statement and that all conversations with the defendant would cease. Urban acknowledged that as far as he knew his requests were honored.

Delores Harris testified that in June 1994 she lived at 1628 North Linder, in Chicago, in a second-floor apartment with her two sons (the

defendant and Changa Harris). She stated that the building is a two-flat but has three separate apartments. She noted that her brother and uncle lived in the basement and the defendant's sister lived on the first floor. When the police came to arrest her son around 10:30 a.m., she was in the first-floor apartment getting ready for work because the gas had been shut off in her apartment. She noted that the police returned around 6 p.m. and searched the building. When the search was completed, the police took her to the Lombard police station. She did not recall what time she arrived at the Lombard police station. After she arrived at the station, she talked with attorney Urban in the lobby area. She did not know what time it was when she saw Urban at the station.

Based on the foregoing evidence, the trial court denied the defendant's motion to suppress the statements that he made to the police officers and Assistant State's Attorney Nigohosian following his arrest. The trial court specifically found that the defendant was not denied his right to an attorney. In that regard, the court found that Urban probably arrived at the Lombard police station sometime after 10 p.m., made his presence known, and was immediately led to the back of the station. With respect to Urban's claims that he had made phone calls to the Lombard station, the trial court noted that Urban did not testify to anything more than "I'm looking for Svondo Watson." Moreover, Urban did not ask to speak with the defendant and did not direct that police officers not speak with the defendant. The trial court also found that the defendant initiated the after-dinner conversation with Officer Montalto, that Officer Montalto merely responded to the defendant's question about what was going on in the case, and that Montalto did not confront the defendant with any specific items that had been recovered in the search. Consequently, the trial court concluded, the defendant was not under "interrogation" when he made the inculpatory statements to the police and was not "confronted" with the proceeds from an unlawful search.

### Interrogation/Waiver of *Miranda* Rights Issue

On appeal, the defendant first argues that the trial court incorrectly determined that in making his inculpatory statements the defendant had "initiated" the conversation with the police and that the conversation had not been an "interrogation." The defendant further argues that the trial court erred in finding that the defendant had not been "confronted" with illegally seized evidence.

In response, the State points out that the cases cited by the defendant in support of his argument on the interrogation issue are all distinguishable. The State notes that, in each of the cases cited by the de-

fendant, the suspects expressly asserted their rights to counsel and silence, and yet the police nevertheless subsequently obtained incriminating statements from the suspects. See *Oregon v. Bradshaw*, 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983); *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980); *People v. Olivera*, 164 Ill. 2d 382 (1995); *People v. Sanders*, 55 Ill. App. 3d 178 (1977); *People v. Ruegger*, 32 Ill. App. 3d 765 (1975). In contrast, the instant defendant was warned of his *Miranda* rights at the outset of the interrogation, and he stated several times throughout the day that he understood them. The State maintains that the defendant waived his rights to silence and counsel by agreeing to speak with the officers throughout the day without asserting his rights at any time.

■ Generally, a trial court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous. *People v. Gonzalez*, 184 Ill. 2d 402, 411 (1998). This deferential standard of review applies where the suppression motion turns upon findings of fact and is grounded in the reality that the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve any conflicts in the testimony. *Gonzalez*, 184 Ill. 2d at 412. Where only a question of law is involved, however, the trial court's ruling is subject to *de novo* review. *People v. Carlson*, 185 Ill. 2d 546, 551 (1999). In reviewing a ruling on a motion to suppress, a reviewing court may consider evidence presented at trial as well as evidence presented at the suppression hearing. *People v. Buss*, 187 Ill. 2d 144, 204 (1999).

■ We note that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from the custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Rhode Island v. Innis*, 446 U.S. at 297, 64 L. Ed. 2d at 305, 100 S. Ct. at 1688, citing *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612 (1966). Those safeguards are the now familiar *Miranda* warnings. *Innis*, 446 U.S. at 297, 64 L. Ed. 2d at 305, 100 S. Ct. at 1688. The Supreme Court in *Miranda* held:

> "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any man-

ner that he does not wish to be interrogated the police may not question him." *Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d 706-07, 86 S. Ct. at 1612.

The Court in *Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612. In *Innis*, the Supreme Court considered the meaning of the term "interrogation" under *Miranda*. *Innis*, 446 U.S. at 298, 64 L. Ed. 2d at 306, 100 S. Ct. at 1688. There, upon being arrested and advised of his *Miranda* rights, the defendant asserted his right to counsel. *Innis*, 446 U.S. at 294, 64 L. Ed. 2d at 303, 100 S. Ct. at 1686. While en route transporting the defendant to the police station, the two officers engaged in a conversation about a missing shotgun. *Innis*, 446 U.S. at 294, 64 L. Ed. 2d at 303-04, 100 S. Ct. at 1686. One of the officers stated that there were a lot of disabled children in the area and it would be a shame if one of the children found the weapon and was hurt. *Innis*, 446 U.S. at 294-95, 64 L. Ed. 2d at 304, 100 S. Ct. at 1686-87. At that point, the defendant interrupted the conversation and told the officers that he could show them where the gun was located. *Innis*, 446 U.S. at 295, 64 L. Ed. 2d at 304, 100 S. Ct. at 1687. The Court noted that *Miranda* had held that, once a defendant in custody asks to speak to a lawyer, all interrogation must cease until the lawyer is present. *Innis*, 446 U.S. at 297, 64 L. Ed. 2d at 305-06, 100 S. Ct. at 1688. The *Innis* Court held that the term "interrogation" under *Miranda* refers not only to express questioning but also its functional equivalent—any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308, 100 S. Ct. at 1689-90. The Court then concluded that the short conversation between the officers did not amount to an "interrogation" because it could not be said that the officers should have known that their conversation was reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 302-03, 64 L. Ed. 2d at 308-09, 100 S. Ct. at 1690-91.

■ From the foregoing discussion of *Miranda* and *Innis*, it is clear that statements made to the police pursuant to custodial interrogation are admissible provided that the defendant has voluntarily, knowingly, and intelligently waived his rights. Additionally, we note that an express written or oral statement by the accused of his desire to waive the right to remain silent or the right to counsel is not required for a valid waiver, although it is considered strong proof of waiver. *North Carolina v. Butler*, 441 U.S. 369, 373, 60 L. Ed. 2d 286, 292, 99 S. Ct.

1755, 1757 (1979); *People v. Rogers*, 123 Ill. 2d 487, 495 (1988). A defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may support a conclusion that the defendant has waived his rights. *Butler*, 441 U.S. at 373, 60 L. Ed. 2d at 292, 99 S. Ct. at 1757. Waiver can be inferred from the actions and words of the person interrogated. *Butler*, 441 U.S. at 373, 60 L. Ed. 2d at 292, 99 S. Ct. at 1757. The question of waiver must be determined on the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *Butler*, 441 U.S. at 374-75, 60 L. Ed. 2d at 293, 99 S. Ct. at 1758. Once an accused has been advised of his *Miranda* warnings and acknowledges his understanding of them, the voluntariness of his subsequent statement is not compromised by the police's failure to repeat the warnings at each successive interview. *People v. Hobley*, 159 Ill. 2d 272, 294 (1994). The State need prove waiver of *Miranda* rights only by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 93 L. Ed. 2d 473, 485, 107 S. Ct. 515, 522 (1986); *People v. Reid*, 136 Ill. 2d 27, 54-56 (1990).

█ Because we find that the college-educated defendant clearly waived his rights to silence and counsel by stating that he understood his rights and agreeing to talk to the officers throughout the day without asserting those rights until sometime after the statements were made, we conclude that the defendant's statements were admissible even if the defendant was subjected to "custodial interrogation" at the time of the statements. Thus, the authorities cited by the defendant in support of his argument are all distinguishable and do not indicate that, under the facts of the present case, the defendant's statements must be suppressed simply because he may not have technically "initiated" the questioning and may have been under "custodial interrogation" at the time of his statements.

The defendant relies on the Illinois Supreme Court's decision in *Olivera* in support of his position. Unlike the defendant in the present case, the defendant in *Olivera* invoked his right to the presence of counsel, and his attorney visited him while in custody and advised him not to make any statements to police. *Olivera*, 164 Ill. 2d at 386-87. The defendant was then taken to a lineup. Afterwards, the defendant asked the police officer, "What happened?" The officer responded by telling the defendant that he had been positively identified. *Olivera*, 164 Ill. 2d at 387. The defendant then asked the officer, "What happens next?" The officer then readvised the defendant of his rights, and then the defendant made incriminating statements to the officer. *Olivera*, 164 Ill. 2d at 387. The supreme court noted the rule that, once the defendant invokes his right to counsel, he cannot be

questioned further unless he initiates the questioning "in a way evincing a willingness and a desire for a generalized discussion concerning the investigation" *and* subsequent events indicate a waiver of the right to have counsel present during interrogation. *Olivera*, 164 Ill. 2d at 390, citing *Bradshaw*, 462 U.S. at 1445-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835 (there, the defendant invoked his right to counsel, later he "initiated" further conversation, and then he knowingly and voluntarily waived his right to silence and counsel). The court in *Olivera* concluded that the defendant's statement was not admissible because his initial question after the lineup did not evince a willingness for a generalized discussion about the investigation, and the proper response on the part of the police to the question would have been to advise the defendant of his rights. *Olivera*, 164 Ill. 2d at 290-92. Given that the defendant in *Olivera* asserted his right to counsel before making his statement, we find *Olivera* to be distinguishable from the present case. Each of the other cases cited by the defendant in support of his position is similarly distinguishable. See, *e.g.*, *United States v. Henry*, 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183 (1980) (incriminating statements were made by accused to undercover informant while in custody after sixth amendment right to counsel had attached); *People v. Sanders*, 55 Ill. App. 3d 178 (1977) (incriminating statements made by accused after he asserted his *Miranda* rights); *Ruegger*, 32 Ill. App. 3d 765 (incriminating statements made after the defendant asserted his right to silence).

## Confrontation/Attenuation Issue

We now turn to the defendant's contention that his confession was inadmissible because he was "confronted" with the fruits of an illegal search and the confrontation was a factor in his decision to confess. See *People v. Bates*, 267 Ill. App. 3d 503, 507 (1994). The defendant claims that Officer Montalto's version regarding what he told the defendant had been recovered during the search was not credible. Specifically, the defendant points out that Montalto testified that he did not know at the time of the confession what had been recovered during the search, but Assistant State's Attorney Nigohosian testified that Nigohosian knew about the bullets that had been recovered during the search before he interviewed the defendant. The defendant suggests that Montalto told Nigohosian about the bullets before the defendant's statement and that the record might have explicitly shown that fact if the defendant had been allowed to ask Nigohosian who told him about the bullets. However, the trial court sustained the State's objection to the questioning on the matter, finding that it was an attempt to impeach Montalto on a collateral matter. Citing *People v. Melock*, 149

Ill. 2d 423 (1992), the defendant argues that the trial court improperly prevented him from presenting the circumstances surrounding his confession. In response, the State argues that the trial court properly denied the defendant's attempt to impeach Montalto because, even assuming that Montalto told Nigohosian at 9:20 p.m. about the bullets, that fact would not indicate that Montalto had such information when he talked to the defendant at 8:15 p.m.

We find that the trial court properly denied the defendant's attempted impeachment of Montalto in asking Nigohosian who had told him about the bullets. The defendant did not lay a proper foundation for the testimony by first giving Montalto an opportunity to deny that he told Nigohosian about the bullets. We also agree that it was a collateral matter because, even if Montalto had told Nigohosian about the bullets at 9:20 p.m., it would not have shown that Montalto knew about the bullets at the time Montalto told the defendant of the search.

The defendant's reliance on *Melock* is unpersuasive. There, the court held that the defendant was entitled to present the results of a polygraph examination solely for purposes of determining the reliability of his confession where the defendant claimed that the examiner falsely told the defendant that he failed the test. *Melock*, 149 Ill. 2d at 458-65. Unlike *Melock*, the defendant in the present case was not deprived of his ability to present the circumstances surrounding his confession.

The defendant argues that, even if Montalto only told him that the officers had recovered "a couple of items" during the search, it would still be a sufficient confrontation with "fruit from the poisonous tree" to warrant the suppression of the defendant's statements.

■ ■ If a defendant's knowledge that illegally seized evidence was recovered may have been a factor in his decision to confess, then suppression may be proper. *People v. Bates*, 267 Ill. App. 3d 503, 507 (1994). As a general rule, confronting a suspect with evidence tends to induce a confession by demonstrating the futility of remaining silent. *People v. Turner*, 259 Ill. App. 3d 979, 991 (1994). In *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), the Supreme Court stated the following:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun*, 371 U.S. at 487-88, 9 L. Ed. 2d at 455, 83 S. Ct. at 417, quoting J. Maguire, Evidence of Guilt 221 (1959).

The question of whether a confession has been obtained by the exploitation of a prior illegal police action must be answered based on all the facts of each case, and no single fact is dispositive. *Brown v. Illinois*, 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261 (1975). Among the relevant factors to be considered in making the determination of whether the statement is sufficiently attenuated from prior illegal conduct are (1) whether *Miranda* warnings were given; (2) the temporal proximity of the primary illegality and the confession; (3) the presence of intervening circumstances; and (4) particularly, the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62. The burden of showing admissibility rests on the prosecution. *Brown*, 422 U.S. at 604, 45 L. Ed. at 427, 95 S. Ct. at 2262. Once a defendant establishes the illegality of the police conduct and shows its connection to what is alleged to be the fruit of that illegality, the State has the burden of proving by clear and convincing evidence that the challenged evidence—in this case, the defendant's inculpatory statements—was obtained by means sufficiently distinguishable to be purged of the primary taint. *Turner*, 259 Ill. App. 3d at 992.

In the instant case, the trial court found that the defendant had not been "confronted" with the proceeds from an illegal search. The trial court based its ruling on the fact that the defendant was not being questioned or interrogated at the time the police officer told him about the search, the defendant initiated the conversation with the officer, and the officer merely answered the defendant's question. Furthermore, the court found that the officer did not mention any particular items that had been recovered during the search and the defendant did not ask what had been recovered. The trial court found that the officer was a credible and truthful witness. The trial court also specifically found that the officer did not know what had been recovered during the search at the time he responded to the defendant's question. The court noted the complete lack of any intent on the part of the officer to use specific items of the search to confront the defendant. Finally, the court noted that it was likely that the defendant decided to confess at the point he did because he knew that Keisha Twitty had survived the shooting and would be able to identify him, and he knew that his brother was also being questioned by police and the defendant apparently thought that his brother had "given him up."

In *Turner*, the police illegally searched the defendant's parents' house and seized a pair of bloodstained shoes. *Turner*, 259 Ill. App. 3d at 982. The police confronted the defendant with the bloodstained shoes and with the fact that his alibi had proved to be false. *Turner*,

259 Ill. App. 3d at 983. The State argued that it was the defendant's knowledge that his alibi proved to be false that induced his subsequent confession. *Turner*, 259 Ill. App. 3d at 991. The appellate court applied the *Brown* factors and concluded that, because the defendant's knowledge of the illegally seized evidence may have been a factor in his decision to confess and the police "exploited the fruits" of that illegal seizure, the trial court should have suppressed the defendant's confession. *Turner*, 259 Ill. App. 3d at 991-94.

In *Bates*, the defendant was confronted with the incriminating statements of his codefendant and the gun and drugs found as a result of the codefendant's statement. *Bates*, 267 Ill. App. 3d at 506. The codefendant's statements had been illegally coerced. *Bates*, 267 Ill. App. 3d at 506. As a result, the appellate court found that, because the defendant's knowledge of the illegally seized evidence may have played a part in his decision to confess, the defendant's confession had to be suppressed. *Bates*, 267 Ill. App. 3d at 506-07.

In *People v. Jennings*, 296 Ill. App. 3d 761, 763 (1998), the defendant was arrested without probable cause. He confessed at the police station after officers illegally seized his jacket. *Jennings*, 296 Ill. App. 3d at 763. The defendant had also been confronted with other proper evidence prior to his confession. *Jennings*, 296 Ill. App. 3d at 766. The court considered the issue of attenuation and applied the *Brown* factors. The court noted that, admittedly, the defendant was not "confronted," in the literal sense of the word, with the jacket, *i.e.*, he was never directly told a witness to the murder had identified the perpetrator as wearing the exact same jacket. *Jennings*, 296 Ill. App. 3d at 767. Nevertheless, the illegal seizure of the defendant's jacket occurred as he was being led into the interrogation room in which he would admit to shooting the victim. *Jennings*, 296 Ill. App. 3d at 767. Moreover, the court noted, the fact that the defendant was wearing the jacket inside out suggested that he was aware of the potentially incriminating nature of the jacket. *Jennings*, 296 Ill. App. 3d at 767.

Turning to the present case, we believe that the trial court correctly concluded that the defendant was not confronted with the proceeds of an illegal search as were the defendants in *Turner*, *Bates*, and *Jennings*. Here, Officer Montalto did not mention any specific items that had been recovered during the search and only mentioned the search in passing and in response to the defendant's question. Although the defendant in *Jennings* was not technically "confronted" with his jacket, the fact that the police seized the jacket from his person and that he was wearing it inside out at the time suggested that he was aware of the incriminating nature of the jacket. *Jennings*, 296 Ill. App. 3d at 767. In contrast, nothing in the present case

indicates that the defendant was aware that the police had recovered any incriminating evidence during their search. Because the defendant was not "confronted" with the proceeds of an illegal search, we hold that under the peculiar facts of the present case, the defendant failed to show a sufficient connection between the illegal search and the defendant's confession.

The defendant relies upon *United States v. Patino*, 830 F.2d 1413 (7th Cir. 1987), and *United States v. Fazio*, 914 F.2d 950 (7th Cir. 1990), in support of his argument that it was not necessary that the defendant be literally "confronted" with the proceeds from the illegal search for the "fruit of the poisonous tree" doctrine to apply. However, we find the defendant's reliance on *Patino* and *Fazio* to be misplaced.

In *Patino*, Federal Bureau of Investigation (FBI) agents illegally entered defendant's apartment, pointed a shotgun at her, and held her in her bathroom while agents searched the apartment and arrested her codefendant. *Patino*, 830 F.2d at 1414. The agents told the defendant that they could prove that she had been involved in four bank robberies. *Patino*, 830 F.2d at 1414. About 20 minutes after the search began, defendant made a confession, which was taken at her apartment by the agents over a 2½-hour period. *Patino*, 830 F.2d at 1414. The Court of Appeals for the Seventh Circuit applied the *Brown* factors and found that the statement was the fruit of the poisonous tree. *Patino*, 830 F.2d at 1418-19. The court noted that the confession was temporally proximate to the unconstitutional search and that the violation had a quality of purposefulness about it—the entry was unpeaceful and secretive, and the agents had ample opportunity to obtain a search warrant but chose not to do so. *Patino*, 830 F.2d at 1418.

In *Fazio*, the police illegally searched the defendant's restaurant while the defendant was present. *Fazio*, 914 F.2d at 952. While opening a safe, the defendant told police that he had a marijuana joint inside a sealed envelope within the safe. *Fazio*, 914 F.2d at 952. During the course of the search, the defendant told the police that he wanted to cooperate and make a statement. *Fazio*, 914 F.2d at 952. The defendant then drove his own vehicle to the police station, where he made incriminating statements that were tape-recorded. *Fazio*, 914 F.2d at 952. The Court of Appeals for the Seventh Circuit determined that the defendant's statements were sufficiently attenuated from the illegal search to render the statements admissible. *Fazio*, 914 F.2d at 958.

We find *Patino* and *Fazio* to be distinguishable from the present case. Unlike the instant case, the police in *Patino* made an illegal and forceful entry of the defendant's home while the defendant was present. See *Patino*, 830 F.2d at 1414. Similarly, the defendant in *Fazio* was present during the illegal search of his restaurant when police

discovered contraband. See *Fazio*, 914 F.2d at 952. The fact that the court in *Fazio* found the statements admissible actually supports the State's position, even though the court found the statement admissible based on its being sufficiently attenuated from the illegal search. In both of those cases, the illegal searches were more directly connected to the defendants' confessions. Furthermore, in all the cases discussed above, the police conduct was much more egregious than in the present case. Here, there is a complete lack of any exploitation of the illegal police activity. Officer Montalto did not tell the defendant what had been recovered during the search and only mentioned the search in response to the defendant's question. Additionally, the allegedly incriminating evidence recovered during the search was not recovered from the defendant's apartment but from another apartment in the building. Officer Montalto told the defendant only that *the defendant's* "house" had been searched and not that the other apartments of the building had been searched.

Furthermore, after considering the *Brown* factors, we conclude that the defendant's confessions did not come about by exploitation of the illegal search and were therefore admissible. With respect to the first factor, the defendant's confessions were given voluntarily and he had been given *Miranda* warnings. While not conclusive, this is an important factor to be considered. *Brown*, 422 U.S. at 603, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261. With respect to temporal proximity, the defendant agreed to make his statement immediately after being informed of the search. However, this was the first contact that the defendant had with the police following dinner. At the time, the defendant already knew that one of the victims of the incident had survived, and there is some indication that the defendant thought that the defendant's brother had made statements incriminating the defendant. There was also some evidence presented that the defendant had begun a confession earlier in the day by describing where he had discarded the weapon. Under the circumstances, we do not find this factor to be conclusive. Finally, with respect to the purpose and flagrancy of the official misconduct, we note that the search warrant in this case was invalid because the two-flat building at which the defendant resided was wrongly labeled a "house." At the hearing on remand, the State presented some evidence indicating that the entire building was being used by various members of the defendant's family as a house and not as separate apartments. Thus, the trial court noted that the police might have been able to get a warrant if they had specifically pointed out the actual use of the house to the judge issuing the warrant. Under the circumstances, we do not find the official misconduct in this case to be particularly flagrant. Moreover, Officer

Montalto did not evince any intent to exploit the misconduct in this case as shown by the fact that he did not tell the defendant what had been recovered during the search. In fact, the officer did not know what had been recovered. Under these circumstances, we hold that the defendant's statements were sufficiently attenuated from the illegal search to render the statements admissible.

### Sixth Amendment/Article I—Right to Counsel Issue

■ The defendant next argues that his right to counsel under the sixth amendment of the United States Constitution and under article I of the Illinois State Constitution was violated when the Lombard police department failed to inform him of his attorney's efforts to reach him. The defendant claims that the evidence showed that his attorney contacted the police and informed them that he represented the defendant and was coming to see the defendant. The defendant also claims that, once his attorney arrived at the police station, the police failed to timely admit his counsel to see him. The defendant maintains that, under the circumstances, his statements were obtained in violation of his constitutional right to counsel and, therefore, must be suppressed.

In *People v. McCauley*, 163 Ill. 2d 414, 421 (1994), the supreme court ruled that statements made by the defendant after his attorney was present at the police station and was refused access to the defendant must be suppressed as a violation of article I, section 10, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 10), regardless of whether the defendant was aware of his counsel's retention. *McCauley*, 163 Ill. 2d at 437. The focus in *McCauley* was on the prevention of the attorney from conferring with the defendant. *McCauley*, 163 Ill. 2d at 444-46. There, the defendant's family retained the attorney. *McCauley*, 163 Ill. 2d at 418. The attorney went to the station and asked to meet with the defendant and was denied access. *McCauley*, 163 Ill. 2d at 418-19. In the meantime, the police proceeded to interrogate the defendant and obtained incriminating statements. *McCauley*, 163 Ill. 2d at 418-20. In reaching its ruling in *McCauley*, the supreme court relied upon a portion of its previous holding in *People v. Griggs*, 152 Ill. 2d 1 (1992):

> "[A] suspect's waiver of his right to counsel is invalid if police refuse or fail to inform a suspect *** of the efforts of the attorney, present at the place of interrogation, to render assistance to the suspect. To hold to the contrary would be to condone 'affirmative police interference in a communication between an attorney and a suspect.' " *Griggs*, 152 Ill. 2d at 29, quoting *Moran v. Burbine*, 475 U.S. 412, 456 n.42, 89 L. Ed. 2d 410, 443 n.42, 106 S. Ct. 1135, 1159 n.42.

In *People v. Milestone*, 283 Ill. App. 3d 682 (1996), the Appellate

Court, Third District, extended *McCauley* by holding that "the physical presence of the attorney at the police station is not required, and *McCauley* applies when the attorney is attempting to contact the defendant by telephone, but is prevented from doing so by the actions of police." *Milestone*, 283 Ill. App. 3d at 686. The record in *Milestone* showed that an attorney retained by the defendant's family called the police station, identified himself as an attorney, and asked to speak with the defendant. *Milestone*, 283 Ill. App. 3d at 684. When the attorney's request to speak with the defendant was refused, the attorney requested that the police tell the defendant that the attorney wished to speak with him. *Milestone*, 283 Ill. App. 3d at 685. The appellate court concluded that the trial court erred in not suppressing statements made by the defendant after the attorney asked to speak with the defendant by telephone. *Milestone*, 283 Ill. App. 3d at 687.

Applying the rationale of the above-mentioned cases, we find that the trial court did not err in finding that the defendant was not denied his right to an attorney. The trial court specifically found that the defendant's attorney did not show up at the Lombard police station until sometime after 10 p.m., that the defendant had already given his three statements by the time the attorney arrived, and that the attorney did not ask to speak to the defendant or give any directions regarding the defendant when he called the station to inquire as to the defendant's whereabouts. From our review of the record, we are unable to say that the trial court's factual determinations on these matters were manifestly erroneous.

Relying on *McCauley* and *Milestone*, the defendant contends that, once the attorney telephoned the police station and informed the police department that he represented the defendant, the police officers were required to inform the defendant of the attorney's calls and to give the attorney a reasonable opportunity to be present during interrogation. However, we do not believe that any such requirement exists. Neither *McCauley* nor *Milestone* held that the mere fact that an attorney has been retained results in the obligation of the police to inform the defendant of that fact absent any directions from the attorney to do so. In the present case, the record does not indicate that there was any police interference between the communication of an attorney and the suspect. Unlike *McCauley* and *Milestone*, the police in the present case did not do anything to prevent the attorney from conferring with his client.

Finally, the defendant argues in his reply brief that his sixth amendment right to counsel attached by 5:30 p.m. on June 7, 1994, "due to Nigohosian's adversarial involvement in the investigation."

The sixth amendment right to counsel attaches at or after the ini-

tiation of adversarial judicial proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *People v. Garrett*, 179 Ill. 2d 239, 247 (1997), citing *Kirby v. Illinois*, 406 U.S. 682, 688-89, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82 (1972). The Illinois Supreme Court has held, however, that the level of prosecutorial involvement may be considered in determining whether a defendant's sixth amendment right to counsel has attached. *Garrett*, 179 Ill. 2d at 248. In *Garrett*, the court noted that, during the filing of the complaint, two hearings, and defendant's detention and lineup, there was neither significant prosecutorial involvement nor a commitment by the State to prosecute. *Garrett*, 179 Ill. 2d at 251. Accordingly, the court found that the defendant's right to counsel had not attached at his lineup. *Garrett*, 179 Ill. 2d at 251.

In *People v. Thompkins*, 121 Ill. 2d 401 (1988), the defendant confessed to the police in the lockup area while awaiting his initial court appearance. *Thompkins*, 121 Ill. 2d at 431. A complaint for preliminary examination charging the defendant with murder had already been made and the defendant had already spoken with the assistant State's Attorney when the defendant made his inculpatory statements. *Thompkins*, 121 Ill. 2d at 433-34. The court held that adversarial judicial proceedings had not been initiated against the defendant at the time of his interrogation and found that the complaint did not constitute a formal commitment by the State to prosecute. *Thompkins*, 121 Ill. 2d at 433.

In the present case, as in *Garrett* and *Thompkins*, at the time of the defendant's statements there had been no formal charge, preliminary hearing, indictment, information, or arraignment. There is nothing in the record indicating that the State had made any decision to charge the defendant. Moreover, we do not believe that the prosecutorial involvement in this case was significant enough to warrant a finding that the defendant's sixth amendment right to counsel had attached. There is no indication that the prosecutor had any significant involvement in procuring the warrant for the search of the defendant's apartment. The prosecutor did not gather any of the information contained in the warrant and did not personally view the building that was the site of the search. Instead, Officer Alagna gathered all of the information in the warrant through his own investigation. The prosecutor simply assisted Officer Alagna in typing the warrant and then presenting it to the judge. There was also an absence of any prosecutorial involvement in the defendant's arrest. Additionally, Lombard police officers were mostly responsible for conducting the questioning of the defendant throughout the day. Accordingly, we determine that the defendant's sixth amendment right to counsel had not attached at the time of his statements.

888

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

INGLIS and HUTCHINSON, JJ., concur.